UNITED STATES *v.* NEW YORK MERCHANDISE CO., INC. (No. 4454) [1]

United States Court of Customs and Patent Appeals, April 4, 1944

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks* and *Samuel D. Spector*, special attorneys, of counsel), for the United States.

*Siegel & Mandell* for appellee.

[Oral argument February 1, 1944, by Mr. Weeks and Mr. Mandell]

[1] C. A. D. 274

214

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

On October 23, 1939, the appellee imported into the United States from Japan 100,000 tungsten torch lamps or electric-light globes, which had been made with American filaments. The merchandise was invoiced at 2.80 yen per 100 pieces, less inspection fees amounting to 76.56 yen. Appraisement was made on the basis of United States value as defined in section 402 (e) of the Tariff Act of 1930, at $16.544 per thousand pieces, packed.

Appellee filed an appeal for reappraisement directed against the finding of United States value and claiming that the cost of production should have been taken, and the Government cross-appealed, claiming that $16.544 per thousand pieces, packed, was erroneous and that the proper value, if United States value was to be taken, was $18.517.

At the trial, on reappraisement, it was stipulated and agreed for the purpose of the trial, that the sole issue to be decided was whether or not the final appraised value should be based upon the United States value or upon the cost of production, and that if the United States value was the proper basis to be applied, the proper dutiable value was $18.517 per thousand pieces, net, packed, but that if the cost of production was found to be the proper basis, the invoice value, to wit, 2.80 yen per hundred pieces, represented the cost of production. It was also agreed that there was no foreign value or export value of the instant merchandise.

At the trial the appellee introduced the testimony of one witness, Dr. Abraham Buschman, who was in charge of the electrical division of the appellee. In such position he was familiar with the construction of the imported bulbs and with their sale and all related material facts. There is little dispute as to what the testimony of the single witness shows, although there is some difference between the appellant and the appellee as to how certain phases of the testimony should be construed, and there is spirited controversy as to the force to be given said testimony in arriving at a determination of the kind of value to be applied.

From the testimony of the single witness and from the admissions of the parties, we think the material facts of record are as follows: The merchandise was exported from Japan on September 21, 1939. There was never any agreement in existence between Stanley Electric Company, the Japanese producing company, and the appellee regarding the merchandise prior to the orders and their acceptance. The imported merchandise consisted of what is referred to as "XL" globes, and the globes were imported in five colors, white, blue, green, red, and orange. They are used as Christmas lamps, eight in a line,

and each globe is equipped with a "shunt" feature, which controls the current so that it is distributed among the remaining seven lamps when one of a line is burned out. It would seem that these "shunt" lamps were particularly desirable when used in Christmas sets, but that the sets were not imported. The importer in the present instance adds "a good deal of domestic value" in manufacturing the sets. The springs, sockets, brass screw shells, rayon covered wire, and the electrical attachment plugs are supplied in this country.

Appellee is the owner of a patent on the "shunt" feature of the lamps here involved, and the lamps are sold under the trade-mark "XL." The particular globes here involved contain a small tube that holds a substance known as "Galena." There were other imported "shunt" filament lamps sold in this country on or about the time of the exportation of the instant merchandise. While they served the purpose of avoiding all of the lamps' going out when one of them failed, they were of an entirely different construction from those at bar. They had a powder similar to the "Galena" which was used in the tubes of the "XL" lamps, and the witness stated that this powder was "something similar to iron ore, distributed in the cement of the base of the lamp instead of having it in a separate tube."

At the time of exportation of the instant merchandise, i. e., on or about September 21, 1939, there was no stock of such or similar imported merchandise on hand which was or could have been offered for sale. There were in appellee's warehouse 10,000 red globes, but they were of no value for selling purposes unless similar globes of other colors were available for sale with them. In the year 1939 up until September 21, appellee, according to the witness, had taken orders in this country for 12,483,140 lamps and had received on its orders 600,000 lamps. The witness stated: "We had 883,000 lamps up to that time that were not delivered, but were sold." There is some confusion in the record about the percentage of lamps received as compared with the number of lamps for which orders had been taken, but the exact number for which orders had been taken and the exact number of lamps received by appellee are, for reasons which are stated herein, of little importance in deciding the issue here involved.

When an order was placed with the Japanese concern, the resulting imported merchandise was committed to sales or contracts for sales already made or entered into in this country. This character of lamp was ordinarily ordered in the spring or summer for delivery some time before the succeeding Christmas. It occurred often that the exact number of different colors actually shipped from Japan did not correspond to the number of each kind which had been ordered. Apparently, this latter fact was the occasion for having 10,000 red lamps in stock on the date of exportation, which had been committed to orders

made long prior thereto and which were held and eventually delivered along with other colors later received.

The witness testified that 10,000 of such lamps were "a good wholesale quantity." He stated that the importer had "XL" lamps in its warehouse in August of 1939 and that it was distributing them to its customers, shipping them "against old orders." We quote the following from Dr. Buschman's testimony:

R. X Q. * * *. When you ship orders over to Japan, you ship orders for a certain number of lamps for each color?—A. That is right.

R. X Q. When the lamps came over here to the warehouse, your order or stockroom clerk took a batch of orders, domestic orders, in his hand, and took order upon order, and if one order called for 2,000 red, green, yellow, blue, and pink, he went to this stockroom and took 2,000 of each color as specified in the order?— A. That is right.

R. X Q. So that the orders you gave to Japan were not specific deliveries upon each specific order in this country?—A. I never said that.

The testimony was positive, however, that when the goods did arrive, which months before had been ordered, they were irrevocably committed to filling orders on hand and could not be the basis of new offers of sale.

The record is not very clear on a number of phases of the case. The case was tried below upon the theory that there were no other imported lamps such as or similar to those at bar being offered for sale by other importing concerns during the critical period here involved. The Government does not contend that there is any basis for a finding of United States value unless it rests upon the fact that (1) "XL" lamps were being sold or offered for sale in this country within thirty days of the date of exportation of the imported merchandise, (2) there were 10,000 red "XL" lamps in the importer's warehouse on the date of exportation, or (3) there were sales of other "shunt" lamps which the witness stated served the same purpose as the instant merchandise. It does not contend that appellee has failed to prove that there were no imported lamps other than those above referred to which might have been handled in this country by other importers during the critical period, so as to form the basis of United States value.

Meager as the record is, it would seem to show that there were no other lamps identical with or similar to those at bar offered for sale by others at such time and in such manner as to form the basis for United States value. There was an imported "shunt" lamp of different construction, as before suggested, sold in this country at or about the time of exportation of the instant merchandise for, according to the witness, as much as $7 or $8 per thousand less than the price at which the instant merchandise was sold. Their construction was different, as before stated, although their purpose was identical. At times, owing to the scarcity of this character of imported goods, appellee sold as "XL" lamps some of the merchandise which did not

contain the tubes as aforesaid and which, by others, was sold at a lower price.

On the date of exportation of the goods at bar, lamps of this character were displayed on cards and otherwise in appellee's showroom for the purpose of taking orders, but the record is clear that appellee at no time had in stock lamps of this character which it could freely offer for sale to all purchasers. It could not offer, packed ready for delivery or otherwise, previously imported lamps in its warehouse because they were committed to contracts of sale entered into months before.

Congress, in the Tariff Act of 1930, section 402 (e) has defined United States value as follows:

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

The single judge of the United States Customs Court sitting in reappraisement, basing his decision for the most part upon the existence in warehouse of the said 10,000 red "shunt" lamps, held that the proof afforded evidence of United States value. He found that value to be $18.517 in accordance with the stipulation, and he directed that judgment be entered accordingly.

Upon appeal, the appellate division of the United States Customs Court, Second Division, reversed the judgment of the trial court and held, in substance, that the facts of record afforded no basis for finding a United States value for the goods at bar and found, in accordance with the stipulation, that the proper dutiable value of the imported merchandise was the cost of production, 2.80 yen per 100 pieces. From the judgment of said appellate division, the Government has here appealed.

The Government points out that in the month of August 1939, according to the witness, "XL" lamps of the kind here involved were shipped against old orders. It argues, therefore, that "prototype" merchandise was sold within thirty days of the date of exportation of the merchandise at bar.

It is the position of the Government that the phrase "at the time of exportation" does not literally mean on the exact day of exportation. It supports the holding of the reappraising judge to the effect that it was only necessary for the record to show that such or similar mer-

chandise was freely offered for sale, etc., in this country "at or near the time of exportation." It urges that the 10,000 lamps in the warehouse on September 21, 1939, which had been previously imported under the circumstances stated, properly formed the basis for United States value. It relies upon the holdings of this court, on frequent occasions, that merchandise imported *on or about the time of exportation* of the merchandise whose value was being ascertained might properly afford a basis for finding a United States value. The following cases are cited: *The Stern Hat Co.* v. *United States*, 26 C. C. P. A. (Customs) 410, C. A. D. 48; *United States* v. *G. W. Sheldon & Co.*, 23 C. C. P. A. (Customs) 245, T. D. 48108; and *United States* v. *Collin & Gissel*, 29 C. C. P. A. (Customs) 96, C. A. D. 176.

The appellee contends here, as it did in the court below, that "there was no such or similar imported merchandise to that here involved freely offered for sale packed ready for delivery in the principal market of the United States to all purchasers on the date of exportation," and that the record clearly establishes that "on or about the date of exportation there was no such or similar previously imported merchandise freely offered or available for sale packed ready for shipment." Numerous decisions are cited by the appellee.

The law upon the construction of section 402 (e), *supra*, is, we think, fairly well settled, and without quoting extensively from the foregoing cited cases, we think the following principles applicable to United States value are definitely settled: First, the value of the imported merchandise to be arrived at must be based upon the price at which such or similar *previously imported* merchandise is freely offered for sale to all purchasers, packed ready for delivery, etc., at the time of exportation of the imported merchandise. Second, the phrase "at the time of exportation" does not necessarily mean the hour or the day of exportation, but a time near enough to the date of exportation and under such circumstances as will reflect the price of the goods on the date of exportation. It is obvious that no definite period prior or subsequent to the exportation can be fixed as a standard for all cases. A fluctuating market, which might be brought about by many reasons, might make a date of sale or offer in this country prior or subsequent to the date of exportation an improper one to accept in determining the question here involved. On the other hand, the proof might show a steady, unvarying market or other conditions which would make a date months removed from the date of exportation a proper one to reflect what the price was on the date of exportation.

In considering the importance of arriving at the right conclusion in the instant case on the decision of this important and sharply controverted question, we think it not improper to say, and it has been elsewhere often said, that in arriving at United States value or the cost of production under the act of 1930 of other acts similar in character,

we must take into consideration the fact that Congress was trying, by including certain items and excluding others, to arrive at what might be comparable to a foreign value or an export value if there had been one, and that Congress sought to apply as a settled tariff policy the foreign or export value whenever it was applicable, in preference to the United States value, which was obviously a less satisfactory basis for arriving at the final appraised value. Under such circumstances, in arriving at a determination as to whether United States value has been shown, it should clearly appear from the record that the facts fully warrant its application.

Now, in the light of the foregoing principles, it is our view that the appellate division correctly interpreted the statute and properly construed and applied the evidence in the instant record. It stated:

The record shows that the involved merchandise was exported on September 21, 1939, and that on or about that date the importer herein had not made any sale of such or similar merchandise previously imported; that on or about said date the importer did not offer for sale in any manner such or similar imported merchandise, and that on or about said date the importer did not have for sale any such or similar imported merchandise.

The only witness who testified stated that New York, N. Y., was the principal market for the sale of merchandise such as or similar to the imported merchandise. After qualifying as being thoroughly familiar with the lamp trade in New York City the witness also testified that there were other shunt filament lamps offered for sale on the market here by other importing houses, but that said lamps were of a different construction and that these lamps were sold for from $7 to $8 per thousand pieces less than the imported merchandise.

The record shows, however, that on September 21, 1939, the importer herein had in his warehouse 10,000 red lamps which had been previously imported. These were packed and reshipped to the warehouse, because red alone has no value. "You have to have five colors"; that on or about September 21, 1939, the importer herein did not have available for sale or to be offered for sale any imported lamps such as or similar to those in this case.

The witness further stated "In the first place you cannot sell red alone"; those red lamps were on hand "Because we were waiting for the other colors to come in to make good deliveries against other orders we had on hand"; that this case of red lamps was not offered for sale and was not available for sale on or about September 21, 1939; that if a man had offered him five cents more per lamp for the 10,000 red lamps than the price at which they were already committed, he would not and could not have sold them to him, because they had already been committed against orders previously sold totaling 883,000 lamps.

As we interpret the decision of the said appellate tribunal, it did not intend to hold that *on the exact date of exportation* of the merchandise at bar it was necessary for the record to show that the importer had made sales or offers for sale or had for sale such or similar merchandise, although excerpts from the opinion, not quoted above, might, where the exact language of the statute—"at the time of exportation"—is used, if narrowly construed, be interpreted to the contrary.

We think the record supports the findings of the appellate tribunal above-quoted. Certainly, it cannot be said that there is no substantial evidence in support thereof.

A consideration of the foregoing proven facts, it seems to us, clearly warrants the conclusion that at no time on or about the date of exportation of the instant merchandise were imported goods such as or similar to those at bar freely offered for sale, packed ready for delivery, in the usual wholesale quantities in the principal market of the United States to all purchasers; nor, for that matter, were any such offers as contemplated by the statute made at any time during the period covered by the testimony in this case. Under such circumstances, it should be held that upon the instant record the cost of production formed the proper basis of value to be applied to the instant merchandise, and we so hold.

The judgment appealed from is *affirmed*.